OPINION
{¶ 1} Appellant Jerry Semenchuk ("father") appeals two September 27, 2004 Judgment Entries entered by the Licking County Court of Common Pleas, Juvenile Division, which overruled father's objections to the Magistrate's November 21, 2003 Decision and affirmed the Magistrate's recommendation permanent custody of Kyle Semenchuk and Zoyie Semenchuk be granted to the Licking County Department of Job and Family Services, Children Services Division ("Agency"). Appellant Robin Zink ("mother") appeals the September 27, 2004 Judgment Entry entered by the Licking County Court of Common Pleas, Juvenile Division, which overruled mother's objections to the Magistrate's November 21, 2003 Decision, and adopted the Magistrate's recommendation to grant permanent custody of Cassandra Zink and Zoyie Semenchuk to the Agency.
 STATEMENT OF THE CASE AND FACTS {¶ 2} On February 26, 2003, the Agency filed a Complaint in the Licking County Court of Common Pleas, Juvenile Division, alleging Cassandra Zink (DOB 2/28/98) was a dependent child and seeking temporary custody of Cassandra. Cassandra Zink is the biological child of mother and Ron Zink.[1] On the same day, the trial court issued an ex parte order placing Cassandra in the emergency shelter care custody of the Agency. On May 15, 2003, the trial court adjudicated Cassandra a dependent child and continued temporary custody with the Agency.
 {¶ 3} On May 27, 2003, the Agency filed a complaint in the Licking County Court of Common Pleas, Juvenile Division, alleging Kyle Semenchuk (DOB 5/21/96) was a dependent child seeking permanent custody of the boy. Kyle is the biological child of father and Kristina Ward.[2] On the same day, the trial court placed Kyle in the emergency shelter care custody of the Agency. The trial court subsequently adjudicated Kyle a dependent child. The magistrate conducted a hearing on the Agency's request for permanent custody relative to Kyle on July 21, 2003. The following evidence was adduced at that hearing.
 {¶ 4} Kristina Ward, Kyle's biological mother, testified she has been married to father for seven years and the two had been together for nineteen years. Ward testified her and father's first four sons were removed by Franklin County Children's Services in April, 1995. Franklin County subsequently was granted permanent custody of the four boys. Ward stated the children had been removed because the family was living in a hotel and father was abusive towards her and the children. Ward described father's abuse as physical, mental, and emotional. Ward stated father refused to work on his case plan through Franklin County Children's Services, and instead made repeated threats to the case managers. Ward stated she and father had both been convicted of child endangering in 2001. She also noted father had been convicted of misuse of a credit card in 1995, and theft in 1996. Ward was sentenced to twelve months on the child endangering conviction, and father was sentenced to two years.
 {¶ 5} Sometime around November, 2002, father met mother over the Internet. Mother subsequently moved into the same apartment building in which Ward and father lived, bringing her three children.[3] Sometime before December, 2002, father left Ward for mother. Prior to father's moving out of his and Ward's apartment, Kyle was living with father's sister, Tammy Cuccio, and her husband. Kyle would visit on weekends and school vacations. According to Ward, father often cursed at the boy. Father also did not watch the child, allowing him to run outside unsupervised.
 {¶ 6} Ward testified she had observed mother being mentally abusive to mother's own children, cursing at them and threatening to throw them out a window of a moving car. Ward stated she and father had never completed any kind of counseling program as was required by their case plans through Franklin County Children's Services. Ward testified, in the past six months, she had observed father smoke pot on occasion. She noted father used crack cocaine during the time the family was involved with Franklin County Children's Services, but father entered rehab during that time. Father drinks alcohol on a daily basis. Ward opined father could not provide a safe and adequate home for Kyle. She conceded she had not seen Kyle since he was placed in foster care, explaining it would be easier for the child if she lost him.
 {¶ 7} Dr. Richard Jackson testified he conducted the psychological evaluation of father in March, 2003. When Dr. Jackson asked father how he became involved with the Agency, father depicted the involvement as an extension of some unfair treatment he had received in Franklin County. Dr. Jackson noted father launched into a couple of unusual asides, speaking very rapidly and indicating the involvement with the Agency "was similar to the sort of things that brought back the American Revolution." July 21, 2003 Tr. at 161. Dr. Jackson described father's rapid presentation as part of a manic pattern. Dr. Jackson acknowledged father functions at least on an average range. The personality testing indicated father tended to see his world in suspicious terms, which could reach paranoid proportions. The testing further revealed father is quite resistant to change, very egocentric, and solves problems by assigning blame. Father's coping skills are extremely unpredictable. Dr. Jackson opined father's personality profile presented very unpredictable behavior in a parenting role, which would be extremely confusing to a child. Dr. Jackson stated father's mental health issues could be become less problematic in one to three years if he received proper medical intervention, counseling, and parenting skills training. Dr. Jackson concluded father's home could not provide Kyle with predictability, security, and appropriate role modeling, which are key to creating the best home environment for a child.
 {¶ 8} Melissa Terry, an investigator for the Agency, testified the Agency received a referral on the Semenchuk family in January, 2003. Terry became involved with the family at the end of February, 2003. She and another worker interviewed Kyle at his school after the Agency received allegations Kyle was living in father's home. Terry subsequently contacted father and mother at their home. When Terry confronted father about a bruise on Kyle's foot, father admitted kicking Kyle, but explained Kyle had tried to kick him so he [father] put his foot up in an attempt to deflect Kyle's kick, but ultimately kicked Kyle. Terry explained the Agency was concerned Kyle was living with father due to father's conviction for child endangering. The Franklin County Domestic Relations Court had ordered father to have no contact with Kyle until further order of the court. The Franklin County Juvenile Court granted legal custody of Kyle to Tammy and John Cuccio.
 {¶ 9} Terry described father's apartment as overwhelming, with things piled up against the walls, including a queen size mattress in the family room. She stated movement within the house was difficult due to the clutter. The apartment contained only one bedroom, which was packed with baskets and boxes piled to the ceiling. Terry described the bathroom as very cluttered and extremely small for four people. Because there was a court order preventing Kyle from living with father, the Agency had also had concerns regarding Cassandra Zink's presence in the home with father.
 {¶ 10} The Agency made contact with Tammy and John Cuccio, who picked up both Kyle and Cassandra, and took the children to their home in Lancaster, Ohio. Three days later, Ron Zink, Cassandra's father, contacted the Cuccios to make arrangements to retrieve Cassandra. The Cuccios told him they did not know about his coming to get the girl. Terry and another worker proceeded to the Cuccio home to check on the children for fear father would go and get them. The Cuccios lived in a trailer, which Terry described as dirty and cluttered with holes in the floor. The trailer had been without water for several days due to a broken water pump or burst pipes. Both children appeared very dirty. The Agency obtained an ex parte order to remove the children from the Cuccio home and to keep father away from them. The children were subsequently placed in foster care. Terry acknowledged she observed a bond between Kyle and father at their visits.
 {¶ 11} Matthew Tracy, an ongoing caseworker with the Agency, testified he became involved with the Semenchuk family on March 12, 2003. Tracy met father on March 20, 2003. At that time, Tracy was concerned about father's mental health and his ability to raise Kyle as well as father's prior conviction for child endangering. During a second meeting between Tracy and father, father told the caseworker about his post traumatic stress syndrome, which father claimed was caused by Franklin County Children's Services. Tracy stated father became very agitated while the two were talking, actually standing up and raising his voice. Tracy felt physically threatened by father during this meeting.
 {¶ 12} Tracy and his supervisor subsequently met with father to review the case plan. At that time, father told Tracy he would not sign the case plan until he had legal representation. Tracy met with father approximately ten times. During each visit, Tracy asked father if he had set up the appropriate appointments. Each time, father advised Tracy he had not done so. During the last couple of meetings, father was more agitated, verbally attacking the Agency. Tracy stated he did not inspect father's apartment because he was fearful to go there due to father's threatening behavior. Tracy acknowledged father's visits with Kyle were usually pretty appropriate although Kyle was very standoffish at the beginning of each visit. Tracy reiterated father had not sought or obtained any services to address the issues of his ability to parent or provide a home for Kyle. Tracy also noted he had received approximately ten to fifteen emails from father between March and July, 2003. In these emails, father continued to claim the Agency's actions stem from the Franklin County situation, and asked Tracy to help him take down Franklin County Children's Services.
 {¶ 13} Father called several witnesses and testified on his own behalf to support his position his apartment was clean and his parenting was appropriate. Upon conclusion of the evidence, the magistrate took the matter under advisement.
 {¶ 14} On August 5, 2003, mother gave birth to Zoyie Semenchuk. That same date, the trial court issued an ex parte order placing Zoyie in the emergency shelter care custody of the Agency. On August 6, 2003, the Agency filed a complaint alleging Zoyie to be a dependent and/or neglected child, and seeking permanent custody of the newborn. The magistrate conducted a dispositional hearing with respect to Cassandra Zink and Zoyie Semenchuk on October 30 and 31, 2003. The Agency had previously filed for permanent custody of Cassandra Zink in June, 2003. The following evidence was adduced at that hearing.
 {¶ 15} Ron Zink testified he is married to mother although the two had been separated for a year and were currently in divorce proceedings. Zink stated he does not acknowledge Zoyie as his child and has no intention of being a parental figure in her life. Zink testified he has never had any contact with Zoyie. With respect to Cassandra, Zink stated he last saw the girl around Christmas, 2002. Zink explained, although the Agency had contacted him shortly after Cassandra was removed from mother and father's home and he intended to bring the girl into his care, he never did so because of transportation problems. Zink was caring for his and mother's two other girls, Cheyenne and Tabitha. Mother had originally taken all three girls with her when she moved in with father. However, mother was unable to handle all three children at one time. Zink acknowledged Cheyenne and Tabitha were difficult children to raise and they were currently involved with Stark County Children's Services. Zink stated he thinks mother is a fabulous mother and father could be a good father if given the chance.
 {¶ 16} Mother testified she became involved with father in September, 2002. The two met over the Internet. At that time of the hearing, mother was living with father. Mother acknowledged she had lost permanent custody of her oldest child, Michael, and permanently surrendered custody of her second oldest child, Veronica. As part of her case plan in the instant action, mother was to obtain independent housing from father. Mother acknowledged she has not sought counseling or treatment, explaining she does not have any mental health issues, but has a disability called cerebral palsy. Mother additionally acknowledged Stark County Children Services had removed Cassandra, Cheyenne, and Tabitha from her and Ron Zink's care into 2000. The children were returned to their custody under an order of protective supervision.
 {¶ 17} Father testified he has six biological children, but has not had contact with the oldest four because his rights were "illegally terminated without trial" based upon "manufactured allegations" of sexual and physical abuse. Father acknowledged Zoyie as his biological daughter, but had not taken any steps to have paternity established. With respect to his current case plan, father testified he has complied with everything he can possibly comply with on the plan. Father acknowledged he has not completed Agency parenting classes. Father testified he did not feel it was necessary for him to be on medication to address his bipolar disorder and other mental health issues.
 {¶ 18} Matthew Tracy testified the Agency removed Zoyie from the hospital on August 6, 2003, because mother and father had not complied with the case plans the Agency had implemented with respect to Cassandra and Kyle. Although her case plan required mother to move out of father's apartment, mother never did so. Instead, mother moved some of her belongings into another apartment, but did not actually live in the apartment. Tracy stated he spoke with mother many times throughout her pregnancy regarding what would happen after Zoyie's birth. Mother and father informed Tracy they had both filed for divorce from their spouses and intended to get married. Tracy reiterated mother and father had not done any work on their case plans. Although both underwent psychiatric evaluations, neither followed through with the recommended counseling. Tracy opined neither father nor mother could meet any of Zoyie's basic needs. Tracy also noted the Agency attempted to provide mother and father with individual parenting classes prior to mother and father's visitations with the children. Despite these efforts, mother and father refused to cooperate.
 {¶ 19} At the close of the Agency's evidence, the magistrate adjudicated Zoyie to be a dependent child. The Magistrate proceeded to the dispositional phase of the hearing. Mother and father testified on their own behalf. The magistrate took the matter under advisement.
 {¶ 20} Via three separate Judgment Entries filed November 19, 2003, the magistrate found Kyle, Cassandra, and Zoyie could not be placed with their parents within a reasonable time or should not be placed with their parents, and mother and father had failed continuously and repeatedly to substantially remedy the conditions which led to the children's removals. The magistrate concluded an award of permanent custody would serve Kyle's, Cassandra's, and Zoyie's best interests. After being granted an extension of time in which to file the transcripts of the magistrate's hearings, mother and father filed respective objections to the November 19, 2003 decisions. Via Judgment Entries filed September 27, 2004, the trial court denied mother's and father's objections and affirmed the magistrate's decision.
 {¶ 21} It is from this judgment entry mother and father appeal.
 {¶ 22} Mother assigns as error:
 {¶ 23} "I. The lower court erred in granting permanent custody of the minor children, Cassandra Zink and Zoyie Semenchuk, to the Licking County Department of job family services."
 {¶ 24} Father assigns as error:
 {¶ 25} "I. The trial court's finding of Kyle Semenchuk and Zoyie Semenchuk being dependent and that an award of permanent custody was in the best interest of the children was against the manifest weight of the evidence."
 Mother's Appeal I {¶ 26} Herein, mother asserts the trial court erred in granting permanent custody of Cassandra and Zoyie to the Agency. Specifically, mother submits the trial court's decision was against the manifest weight of the evidence, and the grant of permanent custody was not in the best interests of the children.
 {¶ 27} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (February 10, 1982), Stark App. No. CA-5758, Unreported. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction (1978), 54 Ohio St.2d 279.
 {¶ 28} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court must schedule a hearing, and provide notice, upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.
 {¶ 29} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned and the parents cannot be located; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 30} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.
 {¶ 31} If the child is not abandoned or orphaned, then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.
 {¶ 32} Assuming the trial court ascertains that one of the four circumstances listed in R.C. 2151.414(B)(1)(a) through (d) is present, then the court proceeds to an analysis of the child's best interest. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
 {¶ 33} The trial court determined Cassandra and Zoyie could not or should not be placed with mother at this time or within a reasonable period of time. The trial court specifically found the Agency established by clear and convincing evidence following the removal of the minor children from mother's home, mother failed continuously and repeatedly to substantially remedy the conditions which led to the removal. The trial court found an inability and/or unwillingness on mother's part to work toward reunification.
 {¶ 34} Mother did not complete any aspect of her case plan. Despite repeated instructions not to continue living with father, mother did not move out of or ask father to move out of the apartment the couple shared. Shortly before the October, 2003 hearing, mother moved some of her belongings into an apartment down the hall from the apartment she shared with father. Mother was not truly living in the new apartment. In fact, mother advised her caseworker she and father intended to marry. Additionally, mother failed to follow mental health recommendations and attend parenting classes. The Agency provided mother with a one-on-one parent mentor, who worked with mother prior to visitation with the children. However, mother only appeared for two appointments. Further, mother had previously lost permanent custody of one child, and surrendered custody of another child.
 {¶ 35} Based upon the foregoing, we find the Agency presented clear and convincing evidence it was in the best interests of the children to be placed in the permanent custody of the Agency. We further find the trial court's findings were supported by some competent, credible evidence and were not against the manifest weight of the evidence.
 {¶ 36} Mother's sole assignment of error is overruled.
 Father's Appeal I {¶ 37} In his sole assignment of error, father maintains the trial court's finding Kyle and Zoyie were dependent children, and finding the granting of permanent custody was in the best interests of the children were against the manifest weight of the evidence.
 {¶ 38} Our standard of review is set forth supra.
 {¶ 39} Father argues his admitted paranoia and a conviction for child endangering which is nearly a decade old should not justify the permanent loss of his parental rights. He notes, although he may lead a somewhat different lifestyle from the average citizen of Licking County, such does not mean he cannot provide a loving and caring home for his children. The trial court's decisions were based upon the testimony of individuals who observed limited interactions between father and his children, and who had limited visits to father's home. We disagree with father's assessment of the situation.
 {¶ 40} The evidence clearly shows father has failed to take any responsibility for the situations which resulted in the removal of the children. In addition to not complying with any aspect of his case plan, father threatened the Agency and caseworkers. Dr. Jackson testified father's coping skills are unpredictable, he is resistant to change, and he is potentially dangerous to the children. Father admits to regular alcohol and marijuana use.
Father has a criminal record which includes a conviction for child endangering. That conviction resulted in the involuntary termination of his parental rights with respect to his other children. Father had also visited Kyle and eventually had the boy living with him when a court order specifically prohibited either situation.
 {¶ 41} Based upon the foregoing, we find the trial court's findings of dependency and best interest were not against the manifest weight of the evidence.
 {¶ 42} Father's sole assignment of error is overruled.
 {¶ 43} The September 27, 2004 Judgment Entries of the Licking County Court of Common Pleas, Juvenile Division, is affirmed.
Hoffman, P.J., Wise, J. and Edwards, J. concur
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the September 27, 2004 Judgment Entries of the Licking County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to appellants.
[1] Ron Zink is not a party to this appeal.
[2] Kristina Ward is not a party to this appeal.
[3] Two of the children, Cheyenne and Tabitha, subsequently returned to the home of their father, Ron Zink.